IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**LUMBER LIQUIDATORS, INC.,**

    **Plaintiff,**

v.                                           Civil Action No. 3:19cv153

**CABINETS TO GO, LLC,**

    **Defendant.**

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Cabinets to Go, LLC's ("CTG") Motion to Dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] (ECF No. 3.) Plaintiff Lumber Liquidators responded, (ECF No. 9), and CTG replied, (ECF No. 13). The matter is ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1332.[2] For the reasons that follow, the Court will deny CTG's Rule 12(b)(6) Motion to Dismiss.

---

[1] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

[2] "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332(a). Lumber Liquidators is a citizen of Delaware and Virginia, while CTG is a citizen of Florida. The amount in controversy exceeds $75,000.

# I. Factual and Procedural Background

This breach of contract action arises out of CTG's alleged violation of a covenant not to compete in the sale of hardwood flooring with Lumber Liquidators.

## A. Factual Allegations[3]

In 1994, Thomas D. Sullivan founded Lumber Liquidators—a retailer of hardwood flooring—and served for a number of years as its "chairman of the Board of Directors, its chief executive officer, and its president." (Compl. ¶ 6, ECF No. 1-A.) In early 2010, the Lumber Liquidators Board of Directors (the "Board") learned that Sullivan "owned and operated CTG," a company that sold "kitchen and bath fixtures and building supplies."[4] (*Id.* ¶¶ 7–8.) CTG did not, however, sell flooring products. (*Id.* ¶ 8.) At that time, Sullivan served as the "Chairman of [the Board], was a full-time employee . . . and was Lumber Liquidators' largest shareholder." (*Id.* ¶ 7.) According to the Complaint, the Board, concerned that Sullivan might "usurp corporate opportunities from Lumber Liquidators" or otherwise use "confidential information" to benefit his new company, entered into several agreements with CTG. (*Id.* ¶ 9.)

On June 1, 2010, Lumber Liquidators and CTG's owners executed an agreement allowing Lumber Liquidators "the option to purchase the owner's interest in CTG for a period of ten (10) years (the "Option Agreement")." (*Id.* ¶ 11.) As part of the Option Agreement, Lumber

---

[3] For the purpose of the Rule 12(b)(6) Motions to Dismiss, the Court will accept the well-pleaded factual allegations in Lumber Liquidator's Complaint as true, and draw all reasonable inferences in favor of Lumber Liquidators. *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) ("a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'") (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

[4] At the time, CTG was known as "Designers Surplus." (Compl. 1.) For clarity, the Court will refer to both CTG and its predecessor Designers Surplus as "CTG."

Liquidators agreed to deliver "advertising and marketing consultation services, to [CTG] to assist [CTG] in the development and implementation of a marketing strategy as set forth in a Memorandum of Understanding." (*Id.* ¶ 12.) The Memorandum of Understanding, ("MOU"), executed the same day as the Option Agreement, "sets forth the specific marketing and sales services that Lumber Liquidators was able to provide to CTG." (*Id.* ¶ 15.) These services included "the rental of Lumber Liquidators' customer lists; use of Lumber Liquidators' commercial sales team; media buying services; and cross-promotional marketing." (*Id.*)

Given the close ties between the management of Lumber Liquidators and CTG, both companies also agreed to enter into "reciprocal restrictive covenants." (*Id.* ¶ 16.) Relevant here, CTG agreed to not "engage in the sale of [hardwood] flooring or similar flooring products worldwide" during the term of the MOU and for two years following its termination. (*Id.* ¶ 17.) Lumber Liquidators similarly agreed to refrain from selling kitchen cabinets. (*Id.* ¶ 18.)

Following the enactment of the MOU, CTG utilized Lumber Liquidators marketing and sales services "to generate internet traffic, assist in the graphic design of CTG's promotional catalog . . . and assist with direct mail marketing, production services, and media buying." (*Id.* ¶ 21.) As a result of these services, Lumber Liquidators alleges that CTG was able to "grow its market base and opportunities" and thus received "substantial economic benefit." (*Id.* ¶ 22.)

Lumber Liquidators now claims that CTG has failed to live up to its side of the bargain. Specifically, despite the fact that the MOU "remains in force," CTG "advertises, markets, and sells hardwood flooring and similar flooring products in e-commerce and in its approximately 60 retail stores" in contravention of Section 2.7.1 of the MOU. (*Id.* ¶¶ 20, 23.)

B.   **Procedural Background**

Lumber Liquidators originally filed its Complaint in the Circuit Court for Henrico County, Virginia. (Not. Removal ¶ 9, ECF No. 1.) CTG properly removed the action to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.[5] (*Id.* 1.)

Lumber Liquidators' eight-page Complaint brings a single breach of contract claim against CTG. CTG filed the Motion to Dismiss alleging that the underlying MOU "violates both federal antitrust and Virginia law." (Mem. Supp. Mot. Dismiss 1, ECF No. 4.) Lumber Liquidators filed its response, and CTG replied.

## II.  Standard of Review: Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and

---

[5] Lumber Liquidators did not seek to remand the case to state court, and the deadline to do so has passed.

3

plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193. The Court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 676–79; *see also Kensington*, 684 F.3d at 467 (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *Kolon Indus., Inc.*, 637 F.3d at 440)). This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

"Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense." *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013) (quoting *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011)).

### III. Analysis

CTG does not dispute that it entered into the Option Agreement and the MOU with Lumber Liquidators, nor does it dispute that it now sells hardwood flooring in contravention of

4

the MOU. Rather, it contends that the "MOU is unenforceable on its face" because it:

(1) violates Section 1 of the Sherman Antitrust Act (the "Sherman Act"); and (2) constitutes an invalid and unreasonable restraint of trade under Virginia law.[6] (Mem. Supp. Mot. Dismiss 4–5.) The Court addresses these contentions in turn.

### A. The Court Will Deny the Motion to Dismiss on the Sherman Act Ground

#### 1. Legal Standard: Sherman Antitrust Act

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Because nearly every contract restrains trade in some manner, the Supreme Court of the United States has made clear that "Congress intended to outlaw only *unreasonable* restraints" on trade. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). To determine whether the challenged restraints are "unreasonable," the court must first examine whether the challenged restraints should be

---

[6] CTG also contends that the "MOU is . . . unenforceable under Virginia common law because it lacks consideration." (Mem. Supp. Mot. Dismiss 6) The Court need not linger long over this contention. Under Virginia law, "a promise to forbear to exercise a legal right is adequate consideration to support a contract, and that the forbearance need not be for a time certain." *Allen v. Aetna Casualty & Surety Co.*, 281 S.E.2d 818, 819 (Va. 1981) (finding adequate consideration, but eventually invalidating agreement because it was "too vague and indefinite to be enforced."). Viewing the Complaint in the most favorable light, Lumber Liquidators' promise to forbear from selling kitchen cabinets constitutes adequate consideration to support the MOU. Furthermore, CTG utilized Lumber Liquidators marketing assets— provided through the MOU—to "grow its market base and opportunities." (Compl. ¶ 22.) The provision of such services goes well beyond the mere "peppercorn" of consideration required to support a contract under Virginia law. *Sfreddo v. Sfreddo*, 720 S.E.2d 145, 153 (Va. 2012); *Sager v. Basham*, 401 S.E.2d 676, 677 (Va. 1991) ("a very slight advantage to the one party or a trifling inconvenience to the other is generally held sufficient to support the promise.") Accordingly, the Court concludes that Lumber Liquidators pled sufficient consideration to survive the Motion to Dismiss.

5

evaluated under the "rule of reason" or the "*per se*"[7] standard. *See Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007).

The rule of reason "is the accepted standard for testing whether a practice restrains trade in violation of § 1," *Id.* at 885, and "presumptively applies." *Texaco*, 547 U.S. at 5. Under this standard, a factfinder must analyze "all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977). By taking into account "specific information about the relevant business and the restraint's history, nature, and effect," the Court may "distinguish[] between restraints with anticompetitive effect that are harmful to the consumer and those with procompetitive effect that are in the consumer's best interest." *Leegin*, 551 U.S. at 886.

A small group of restraints invoke the application of the *per se* standard. These restraints are considered *per se* illegal "because they 'always or almost always tend to restrict competition and decrease output.'" *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) (quoting *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U. S. 717, 723 (1988)). Application of the *per se* standard "eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work," *Leegin*, 551 U.S. at 886, and may be applied only where the restraints are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality."[8] *Texaco*, 547 U.S. at 5 (internal quotations omitted). Because the *per*

---

[7] For consistency and to aid the reader, the Court italicizes the phrase *per se* throughout this opinion, even when not italicized in original quotations.

[8] A "classic example[]" of *per se* anticompetitive conduct includes an "agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972). For instance, in *Palmer v. Georgia*, the Supreme Court found an agreement between bar review

6

*se* standard invalidates an entire class of restraint, the Supreme Court has "expressed reluctance to adopt *per se* rules . . . where the economic impact of certain practices is not immediately obvious." *Leegin*, 551 U.S. at 886; *see also Expert Masonry, Inc. v. Boone Cty., Ky.*, 440 F.3d 336, 343 (6th Cir. 2006) ("Except where courts have already carved out certain categories of offenses as proscribed *per se*, there is an automatic presumption in favor of the rule of reason standard." (internal quotations omitted).)

Despite the demarcation made between the two standards of review, there "is often no bright line separating *per se* from [r]ule of [r]eason analysis.[9] *Per se* rules may require

---

companies to not compete against each other in the State of Georgia to be "unlawful on its face." *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 50 (1990).

[9] At times, the Supreme Court has indicated that a third mode of analysis exists as an offshoot of the rule of reason. Under this "quick-look" rule of reason approach, a practice may be declared illegal where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1998). If such an anticompetitive effect seems evident, the burden shifts to the defendant to show that the restraint in fact serves a legitimate procompetitive objective. *Id.* at 771. If those procompetitive justifications are lacking, the court may declare the practice illegal "in the absence of a detailed market analysis." *Id.* at 770.

It is unclear what staying power, if any, the quick-look approach retains today, or how much the quick-look differs from an ordinary rule of reason analysis. The Supreme Court has trended towards not including the quick-look approach when determining which antitrust standard should apply, instead preferring the traditional rule of reason and *per se* dichotomy. *See Leegin*, 551 U.S. at 886; *Am. Express*, 138 S. Ct. at 2283–84. Recently, when the Court has mentioned quick-look as a possible mode of inquiry, it has found it inapplicable. *See Cal. Dental*, 526 U.S. at 770 (finding anticompetitive effects not sufficiently "obvious" to justify quick-look); *Texaco*, 547 U.S. at 5 (finding, in a footnote, that quick-look does not apply.)

Perhaps because of this uncertainty, "lower courts appear to have largely abandoned the quick look approach." Edward D. Cavanagh, *Whatever Happened To Quick Look?*, 26 U. Miami Bus. L. Rev. 39, 40 (2017). Nonetheless, the quick-look approach underscores that antitrust analysis exists on a "continuum" between the *per se* standard and rule of reason. *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 35 (D.C. Cir. 2005) (J. Ginsburg). Overly rigid or "fixed categories" may detract from the central inquiry: "whether the challenged restraint enhances competition." *Id.*; *see also Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 120 F. Supp. 2d 556, 563 (E.D. Va. 2000) ("It is well to remember, however, that the *per se* and [r]ule of [r]eason

7

considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 104 n.26 (1984) ("*NCAA*"). Generally, courts consider restraints that are "horizontal" in nature, or those "imposed by agreement between competitors" to be "unreasonable *per se*." *Am. Express*, 138 S. Ct. at 2283–84; *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015) ("Classic examples [of horizontal restraints] include agreements among competitors to fix prices, divide markets, and refuse to deal."). To show an unlawful horizontal agreement between potential competitors, the record must demonstrate that potential competitors had the "necessary desire, intent, and capability to enter the market." *EngineSpecialties, Inc. v. Bombadier Ltd.*, 605 F.2d 1, 9 (1st Cir. 1979).

Even within horizontal agreements between competitors or potential competitors, "[a] court must distinguish between 'naked' restraints, those in which the restriction on competition is unaccompanied by new production or products, and 'ancillary' restraints, those that are part of a larger endeavor whose success they promote." *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188–89 (7th Cir. 1985) (citing *NCAA*, 468 U.S. at 104). "A restraint is ancillary when it may contribute to the success of a cooperative venture that promises greater productivity and output." *Id.* at 189. As Judge Easterbrook explained in *Polk Brothers:*

> If the restraint, viewed at the time it was adopted, may promote the success of this more extensive cooperation, then the court must scrutinize things carefully under the [r]ule of [r]eason. Only when a quick look reveals that the practice facially

---

analytical approaches are only judicial glosses on the ultimate inquiry under the Sherman Act into the effect of an agreement on competition.")

8

appears to be one that would always or almost always tend to restrict competition and decrease output . . . should a court cut off further inquiry.

*Id.* (internal quotations omitted). The proper inquiry thus requires an investigation into "whether an agreement promoted enterprise and productivity at the time it was adopted. If it arguably did, then the court must apply the [r]ule of [r]eason to make a more discriminating assessment."[10] *Id.* Because of the inherently fact-intensive nature of this inquiry, "disposition of an antitrust suit at the pleading stage is accordingly rarely appropriate." *Cont'l Airlines*, 120 F. Supp. 2d at 563.

### 2. CTG's Sherman Antitrust Argument Fails Because It Contradicts the Factual Allegations of the Complaint and Requires the Resolution of Undeveloped Factual Issues

CTG contends that the MOU "constitute[s] a naked restraint of trade, seeking to divide markets horizontally, which is illegal *per se* under Section 1." (Mem. Supp. Mot. Dismiss. 4.) The Court finds CTG's contention that the restrictive covenants are *per se* illegal (1) contrary to the factual allegations in the Complaint, and (2) premature at the motion to dismiss stage.

First, the basis of CTG's Sherman Act defense contradicts Lumber Liquidator's well-pled factual allegations. Courts may only apply the *per se* standard when conduct "would always or almost always tend to restrict competition and decrease output." *Polk Bros.*, 776 F.2d at 189. Thus, if an agreement "arguably promoted enterprise and productivity at the time it was

---

[10] Once satisfied that the rule of reason applies, courts determine the reasonableness of a restraint on trade through a "three-step, burden-shifting framework" in which

> the [party challenging the restriction] has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. If the [challenging party] carries its burden, then the burden shifts to the [party seeking to uphold the restriction] to show a procompetitive rationale for the restraint. If the [upholding party] makes this showing, then the burden shifts back to the [challenging party] to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.

*Am. Express*, 138 S. Ct. at 2284 (internal citations omitted).

9

adopted," then it must be viewed under the rule of reason. *Id.* Here, Lumber Liquidators avers that the MOU enhanced productivity by permitting Sullivan to continue working for the company while providing CTG with the opportunity to "grow its market base and opportunities"—an opportunity CTG allegedly took full advantage of. (Compl. ¶ 22.) Taking those allegations as true, as required at this stage of the litigation, the Court cannot possibly conclude that the restrictions at hand "would always or almost always tend to restrict competition and decrease output." *Polk Bros.*, 776 F.2d at 189.

Second, it would be premature to determine which antitrust standard—whether the "rule of reason" or "*per se*"—applies at this procedural posture. As the Supreme Court has stated, "*[p]er se* rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct." *NCAA*, 468 U.S. at 104 n.26. Even if CTG's affirmative defense were not distinctly contradicted by the pleadings, the Court has not been presented with sufficient evidence of market conditions to justify imposing the *per se* standard. Indeed, a number of threshold factual issues remain unresolved. For example, the record does not show whether CTG possessed the requisite "desire, intent, and capability to enter the market" when the Parties executed the MOU. *Bombadier Ltd.*, 605 F.2d at 9. Nor does the record show that the restraints within the MOU did not "promote[] enterprise and productivity at the time [they were] adopted." *Polk Bros*, 776 F.2d at 189. Without detailed information about the relevant market, potential competition between the parties, and the effect of the restrictive covenants at bar, the Court cannot properly determine the strength of CTG's defense—and declines to do so—especially in an area where the Supreme Court has cautioned against the premature adoption of *per se* rules. *See Leegin*, 551 U.S. at 886.

The Court's rationale aligns with the general trend of district courts declining to resolve whether the *per se* rule applies at the motion to dismiss stage. *See, e.g., Kamakahi v. Am. Soc'y for Reprod. Med.*, 2013 WL 1768706, at 8 (N.D. Cal. Mar. 29, 2013) (finding at the motion to dismiss stage "that resolution of the issue of which method of antitrust analysis to apply is premature"); *CSR Ltd. v. Fed. Ins. Co.*, 40 F. Supp. 2d 559, 565 (D.N.J. 1998) ("[w]ithout discovery, the court can not make a decision as to whether the conduct alleged is such as would 'always or almost always tend to restrict competition and decrease output.'"); *Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1131, 1133 (N.D. Cal. 2005) ("[w]hatever the merits of [the defendants' procompetitive] arguments, they are intrinsically factual, contrary to plaintiffs' pleading and inappropriate for resolution at the motion to dismiss stage."). Although CTG cites a number of cases to support the proposition that some restraints of trade violate the Sherman Act on their face, those cases applied the *per se* standard to anti-competitive conduct *after* discovery or trial. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 597 (1972) (overturning district court's finding and applying *per se* standard "[f]ollowing a trial on the merits"); *Bombadier Ltd.*, 605 F.2d at 3 (finding that district court did not err in applying *per se* rule "after a five week trial"); *Eli Lilly & Co. v. Zenith Goldline Pharmas, Inc.*, 172 F. Supp. 2d 1060 (S.D. Ind. 2001) (finding *per se* violation of Sherman Act at summary judgment stage.).

CTG's Sherman Act defense contradicts the factual allegations in the Complaint, and would require the Court to prematurely establish a fact-intensive standard of review on a sparse record. Because the Court cannot "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" at this stage of the litigation, the Court will deny CTG's Motion to Dismiss. *Republican Party*, 980 F.2d at 952.

### B. The Court Will Deny the Motion to Dismiss on the Virginia Restraint of Trade Ground

The Court will deny the Motion to Dismiss because the restrictive covenants, as presented in the Complaint, do not violate Virginia public policy. First, the Court lays out the proper legal standard for evaluating restraints of trade under Virginia law. Second, the Court clarifies why the more restrictive legal standard governing employer-employee non-compete clauses does not apply where a covenant binds two business entities. Third, the Court will find that the restrictive covenants cannot be shown an unlawful restraint of trade at the current procedural posture.

#### 1. Legal Standard: Restraint of Trade

Under Virginia law, a contract between two businesses "in restraint of trade . . . will be held void as against public policy if it is [1] unreasonable as between the parties or [2] is injurious to the public." *Therapy Servs., Inc. v. Crystal City Nursing Ctr., Inc.*, 389 S.E.2d 710, 711 (Va. 1990) (citing *Merriman v. Cover, Drayton & Leonard*, 51 S.E. 817, 819 (Va. 1905)). Pursuant to these two so-called *Merriman* factors, the party seeking to enforce a restrictive covenant bears the burden of showing a "legitimate interest to protect," and that the provision is not "so large as to interfere with the interest of the public." *Therapy Servs.*, 389 S.E.2d at 711; *see also Cornerstone Therapy Servs. v. Reliant Post Acute Care Sols., LLC*, 2018 WL 1370863, *3 (W.D. Va. 2018) (adopting *Therapy Services* court's rationale and applying it to a restrictive no-hire provision between two businesses).

To guide this analysis, the Supreme Court of Virginia has determined that "restraints on competition are neither enforceable nor unenforceable in a factual vacuum." *Assurance Data, Inc. v. Malyevac*, 747 S.E.2d 804, 808 (Va. 2013). Indeed, even "a seemingly overbroad restraint [may] be reasonable under the particular circumstances of the case." *Id.* (citing

*Simmons v. Miller*, 544 S.E.2d 666, 678 (2001)). Therefore, Virginia law dictates that the party seeking to enforce a restrictive covenant must be allowed to "present evidence to demonstrate the reasonableness of the restrictive covenant." *O'Sullivan Films v. Neaves*, 2017 WL 4798997, at *8 (W.D. Va. Oct. 24, 2017) (finding that the Virginia Supreme Court's holding in *Assurance Data* "forecloses facial attacks on restrictive covenants").[11]

### 2. The More Restrictive Legal Standard Governing Employer-Employee Restrictive Covenants Does Not Apply Because Those Restrictive Covenants Implicate Different Public Policy Concerns

CTG mistakenly maintains that the more exacting standard employed by Virginia courts in determining the validity of non-compete clauses in employment contracts should apply wholesale to the case at bar. Under that standard, Lumber Liquidators would be forced to prove that the restraint (1) is *no greater than necessary* to protect a legitimate business interest, (2) is not unduly harsh or oppressive, and (3) is reasonable in light of public policy. *See Modern Env'ts, Inc. v. Stinnett*, 561 S.E.2d 694, 695 (2002).

The Supreme Court of Virginia expressly foreclosed that approach in *Therapy Services*. In *Therapy Services*, a restrictive covenant prevented a nursing home from hiring a third-party contractor's therapists "for six months after the Agreements' termination." 389 S.E.2d at 712. Despite this restriction on employment, the *Therapy Services* court applied the less exacting

---

[11] While *Assurance Data*, *Simmons*, and *O'Sullivan* dealt with restrictive covenants in the context of employer-employee non-compete clauses, their rationale in requiring the production of evidence concerning the reasonableness and effect of a restraint on trade holds equal force here. The validity of a restrictive covenant—whether between two companies or an employer and employee—requires a fact intensive inquiry about the relevant market, the effect of the restraints on the public, and other details which cannot be "determined on the pleadings." *O'Sullivan Films v. Neaves*, No. 5:17-CV-00031, 2017 WL 4798997, at *7 (W.D. Va. Oct. 24, 2017). Nonetheless, as more fully discussed in the following section, the case law dealing with employer-employee covenants will not always be applicable in the business to business context, as the two types of contracts implicate distinct—although related—public policy concerns.

13

*Merriman* factors because the contract was not a "restrictive covenant between employer and employee" but rather "a contract between two businesses." *Id.* at 711. The United States Court of Appeals for the Fourth Circuit has similarly applied the *Merriman* factors—whether a contract is unreasonable as between the parties or injurious to the public—to restrictive covenants between businesses, finding that the employment covenant standard unsuitable as it considers unrelated factors such as an "employee's ability to earn a living." *BP Prods. N. Am., Inc. v. Stanley*, 669 F.3d 184, 189 (4th Cir. 2012) (*quoting Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc.*, 618 S.E.2d 340, 342 (Va. 2005)

The case at bar similarly does not implicate an "employee's ability to earn a living," but contemplates a covenant between two sophisticated market actors. *BP*, 669 F.3d at 189. In such circumstances, the Supreme Court of Virginia and the Fourth Circuit have both made clear that courts should apply the less-restrictive *Merriman* factors.[12]

---

[12] Although non-compete agreements between employers and employees and those between two businesses may both be properly referred to as restrictive covenants, they implicate different concerns: the former raises questions concerning an employee's ability to earn a living while the latter implicates broader concerns about the effect of anti-competitive conduct on the economy as a whole. The *Therapy Services* and *BP* courts recognized that distinction, and declined to impose a narrowly tailored standard meant to protect an employee's ability to earn a living on sophisticated entities entering into a business contract. Other courts have made that distinction more expressly. *See Calico Cottage, Inc. v. TNB, Inc.*, 2014 WL 4828774, at 14 (E.D.N.Y. 2014) ("[c]ourts adopt a more rigorous approach [when evaluating an employer-employee covenant] because there 'are powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood.' In contrast, where two business entities agree to a restrictive covenant, there is generally no concern about the loss of individual's livelihood or an imbalance of bargaining power" (internal citations omitted)).

Because this case involves a contract between two business entities, the Court will apply the less restrictive *Merriman* factors. Nonetheless, the Court looks to the numerous Supreme Court of Virginia's decisions concerning employer-employee covenants—particularly *Assurance Data*—for guidance when weighing the effect and reasonableness of a restrictive covenant more generally.

### 3. CTG's Unlawful Restraint of Trade Argument Fails Because It Is Foreclosed by Virginia Precedent and Contradicts the Allegations in the Complaint

CTG contends that the MOU "is too overreaching to be enforceable" and that it violates the public policy of the Commonwealth of Virginia. (Mem. Supp. Mot. Dismiss 6.) The Court finds this contention (1) foreclosed by Virginia precedent, and (2) contrary to the factual allegations in the Complaint.

First, the Supreme Court of Virginia has strongly indicated that the reasonableness of a restriction on trade cannot be resolved on the pleadings. *Assurance Data*, 747 S.E.2d at 808 ("restraints on competition are neither enforceable nor unenforceable in a factual vacuum"). The rationale behind that bright-line rule holds true here. An inquiry into the reasonableness of a restrictive covenant requires both an analysis of whether the party seeking to enforce the covenant possesses a "legitimate interest to protect" and whether the covenant "interfere[s] with the interest of the public." *Therapy Servs.*, 389 S.E.2d at 712. The Court cannot perform that inquiry on a barren factual record, lacking critical information about the relevant market, the relationship between Lumber Liquidators and CTG, and most importantly, the effect—if any—of the covenants on the public. As the party seeking to enforce the restrictive covenant, Lumber Liquidators must be afforded the opportunity to present evidence that the restrictive covenants were not "unreasonable as between the parties or . . . injurious to the public." *Id.* at 711.

Second, even if *Assurance Data* did not completely foreclose facial attacks on restrictive covenants, the MOU would still survive the Motion to Dismiss. Viewing the factual allegations in the Complaint as true, the restrictive covenants protect a legitimate business interest insofar as they ensured that Sullivan and CTG would not use Lumber Liquidators' "confidential information" and "marketing assets" to "usurp corporate opportunities from Lumber Liquidators

for the benefit of CTG." (Compl. ¶¶ 9, 22.) The restrictive covenants thus reasonably allowed Lumber Liquidators to cooperate with CTG without "cutting [its] own throat by doing so." *Polk Bros.*, 776 F.2d at 189.[13]

The validity of a restrictive covenant is intertwined with questions of fact particular to each case. The Court cannot determine the reasonableness of the restrictive covenants "in a factual vacuum." *Assurance Data*, 747 S.E.2d at 808. Because CTG's public policy argument contradicts the allegations in the Complaint—particularly regarding the protection of confidential information—and requires the premature resolution of undeveloped questions of fact, the Court will deny the Motion to Dismiss on this ground.

## IV. Conclusion

For the foregoing reasons, the Court will deny the CTG Motion to Dismiss. An appropriate order shall issue.

/s/

M. Hannah Lauck
United States District Judge

Date: November 8, 2019
Richmond, Virginia

---

[13] Contrary to CTG's assertions, the fact that the restrictive covenants apply worldwide do not render them unenforceable as a matter of Virginia law. *See Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 682 (Va. 2012) ("[t]he lack of a specific geographic limitation is not fatal to the covenant because the noncompete clause is so narrowly drawn to this particular project and the handful of companies in direct competition"). The Court must assess the geographic scope of a covenant alongside the duration and function of the restrictive covenant, not in isolation. *See id.* at 681.

16